**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Appellants

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Martin H. Pritikin -- CA Bar No. 210845
Special Litigation Counsel for SunCal Appellants

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | District Court Case No.  10-CV-4699 |
| LEHMAN BROTHERS HOLDINGS INC, et al., | Judge Holwell |
| Debtors. | On appeal from<br>Bankr. Case No. 08-13555 (JMP) |

**SUNCAL APPELLANTS' *EMERGENCY* MOTION AND MEMORANDUM OF LAW PURSUANT TO FED. R. BANKR. P. 8005 FOR STAY PENDING APPEAL OF ORDER APPROVING DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR AUTHORITY TO COMPROMISE CONTROVERSY IN CONNECTION WITH A REPURCHASE TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER PROGRAM WITH FENWAY FUNDING, LLC *AND* FOR STAY PENDING APPEAL OF ORDER DENYING MOTION OF THE SUNCAL DEBTORS FOR AN ORDER DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY; OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM STAY**

SunCal Communities I LLC, SunCal Communities III LLC, Palmdale Hills Property LLC, SCC/Palmdale LLC, Acton Estates LLC, SunCal Beaumont Heights LLC, SunCal Emerald Meadows LLC, SunCal Johansson Ranch LLC, SunCal Bickford Ranch LLC, SunCal Summit Valley LLC, Seven Brothers LLC, Kirby Estates LLC, SJD Partners Ltd., SJD Development Corp., SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, the debtors and debtors-in-possession (collectively, the "SunCal Appellants"), by and through their undersigned counsel, file this motion ("Motion") on an emergency basis pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") Rule 8005 for a stay pending appeal of that certain *Order Approving Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy in Connection with a Repurchase Transaction with Fenway Capital, LLC and a Commercial Paper Program with Fenway Funding, LLC* (the "Compromise Order") entered by the lower court, the Honorable James M. Peck, Bankruptcy Court for the Southern District of New York on May 13, 2010 (Docket No. 9030) and that certain *Order Denying Motion of the SunCal Debtors for an Order Determining That the Automatic Stay Does Not Apply; or, in the Alternative, Granting Relief from Stay* (the "RFS Order") entered by the lower court on May 17, 2010 (Docket No. 9059). The SunCal Appellants' emergency motion for stay pending appeal of the Compromise Order and the RFS Order before the lower court has been denied. Accordingly, seeking relief in this Court is appropriate. Fed.R.Bankr. P. 8005.

Dated: June 16, 2010                    Respectfully submitted,

                                             /s/ Sean A O'Keefe
                                          Sean A O'Keefe
                                          Paul J. Couchot
                                          WINTHROP COUCHOT, P.C.
                                          660 Newport Center Drive, Fourth Floor
                                          Newport Beach, CA 92660
                                          Telephone: (949) 720-4100
                                          Facsimile: (949) 720-4111

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

## PRELIMINARY STATEMENT

The Compromise Order and the RFS Order at issue in this appeal (hereinafter, collectively, referred to as the "Orders")[1] approve a transaction and deny relief that will enjoin seventeen Chapter 11 cases pending before the United States Bankruptcy Court for the Central District of California, and bar that court from exercising a core and essential statutory power. As explained below, these rulings are contrary to clear precedent in this circuit, violate the automatic stay in the SunCal Appellants' cases, contravene the jurisdictional limits designed into the bankruptcy system, and de facto ratify multiple misrepresentations made by Lehman Commercial Paper, Inc. ("LCPI"), an Appellee herein, since November of 2008 to multiple parties and courts in an effort to thwart the SunCal Appellants' litigation against it and its affiliates in California.

As explained below, if the transaction authorized by the Compromise Order closes – *and such closing is imminent* – and the RFS Order is not reversed, the SunCal Appellants will suffer immediate and irreparable harm. Further, the balance of hardships will clearly weigh in favor of the SunCal Appellants, as the status quo will change 180 degrees. Specifically, LCPI will be able to use post-petition acquired property to thwart the SunCal Appellants' litigation to equitably subordinate claims against them (the "ES Action"), and their associated plan of reorganization (the "Plan"), that has been ongoing for eighteen months. Conversely, LCPI has been dismissed from that litigation and will remain so pending the duration of the appeal. Finally, the appeal of both Orders raises serious questions under Second Circuit law regarding a bankruptcy court approving a transaction clearly designed to achieve an improper or bad faith purpose—specifically, allowing a debtor to acquire property in order to use its automatic stay as a sword rather than a shield.

The transaction at the core of this appeal is the culmination of an ongoing effort by LCPI and its affiliates (the "Lehman Entities") and Fenway Capital LLC ("Fenway") to derail the ES

---

[1] The two orders are interrelated. The Compromise Order authorizes what is in effect injunctive relief and the RFS Order addresses *the effect* of this injunctive relief. Accordingly, the two orders should be considered as a single ruling.

Action and the Plan. This disruptive course began in 2008 and early 2009, with LCPI contending that it was the sole owner of two of the "Disputed Loans" made pre-petition to the SunCal Appellants. Based upon this alleged ownership interest, LCPI insisted that its automatic stay barred the pursuit of both the ES Action and the Plan. In May of 2008, the SunCal Appellants discovered (through third-party discovery) that this representation was false, and they objected to the proofs of claim on file asserting this ownership interest. At the conclusion of an evidentiary hearing on the matter, the California Bankruptcy Court ruled that LCPI had affirmatively misrepresented facts, and that all right, title and interest in the loans described in the Disputed Claims was vested in Fenway (the "Ownership Finding"). As a result, the SunCal Appellants believe that LCPI's stay never applied to these loans.

The Ownership Finding effectively eliminated LCPI's effort to bar the progress of the ES Action and the Plan through the false assertion of its automatic stay. LCPI was later dismissed from the ES Action, and Fenway, the true owner of the claims, was named as a defendant.

After the failure of their first automatic stay gambit, the Lehman Entities and Fenway developed a new litigation stratagem (the "Claims Transaction") to bar the ES Action and the Plan. Under the guise of a purported "compromise," they agreed that Fenway would sell the Disputed Loans to LCPI. LCPI would then substitute into the ES Action in the place of Fenway, and once again insist that the action was barred by LCPI's automatic stay. In essence, this manipulative claims swap would "fix" the missing ownership interest that caused the Lehman Entities' first automatic stay gambit to fail.

At the hearing on the Claims Transaction and the Motion for Relief from Stay, the SunCal Appellants advised the lower court of the objective of the scheme in play – a second abusive effort to convert the automatic stay into a litigation sword. They further advised the lower court that if this bad faith transaction was approved, and the automatic stay was later deemed to bar the ES Action, their reorganization efforts would be irreparably harmed. These arguments were ignored. The lower court not only approved the Claims Transaction, it made an affirmative finding that

once the transaction closed, the ES Action would indeed be stayed, and the lower court refused to grant the SunCal Appellants relief from the automatic stay.

The SunCal Appellants filed a motion for a stay pending appeal with the lower court seeking the same relief prayed for herein. This motion was heard and denied on June 16, 2010.

Consequently, the SunCal Appellants seek a stay pending the duration of these appeals.[2] This duration should be limited.  These appeals present serious issues of law, the record is limited and the transcript is complete. Accordingly, the SunCal Appellants can file their appellate brief, the record and the transcript within fifteen days, and the entire appeal can be resolved within forty five days. ***Since the SunCal Appellants have stipulated to a stay of the litigation stay in California at the Lehman Entities' request through August 26, 2010, no harm will be suffered by the Lehman Entities during the duration of the stay.*** In the event the Court is disinclined to grant a stay of this duration, the SunCal Appellants seek a stay of sufficient duration to enable the appellants to seek stay relief from the Court of Appeals for the Second Circuit.

## II.

## REVIEW OF MATERIAL FACTS

A.    **The SunCal Appellants.**  The seventeen SunCal Appellants and the nine other related entities (collectively the "SunCal Debtors") operating under the protection of Chapter 11 are part of integrated network of residential development entities operating under the common dba "the SunCal Companies" or "SunCal." The SunCal Debtors were formed as part of a joint venture with affiliates of LBHI, including, most importantly, LCPI and non-debtor affiliate Lehman ALI, Inc. ("Lehman ALI") to develop a series of large residential real estate projects in California (the "Projects").[3]

Between 2005 and 2007, Lehman ALI and LCPI (together with OVC Holdings LLC and Northlake Holdings LLC, the "Lehman Entities") made a series of loans to the SunCal Debtors.

---

[2] Pursuant to Federal Rule of Bankruptcy Procedure 8005, the SunCal Appellants have first sought and have been denied this relief by his Honorable Judge Peck, the presiding Bankruptcy Judge in the Appellees' Chapter 11 cases in the Bankruptcy Court of the District.

[3] See Declaration of Bruce Cook ("Cook Dec."), ¶¶ 4-5, attached as exhibit X to the Declaration of Paul J. Couchot ("Couchot Declaration") filed concurrently herewith.

Seven of these loans, totaling approximately $1.5 billion, are relevant to this appeal (collectively the "Disputed Loans"). Two of the Disputed Loans were made by LCPI: The SunCal Communities I loan in the approximate amount of $343 million (the "SunCal I Loan") and the Ritter Ranch Loan in the approximate amount of $287 million (the "Ritter Ranch Loan"). Three loans were made by Lehman ALI (the "Lehman ALI Loans") and two loans (one each) were made by Lehman ALI and subsequently transferred to non-debtor Lehman affiliates Northlake and OVC. All of the Disputed Loans are secured by liens against one or more of the Projects.

The initial joint venture projects that SunCal entered into with Lehman Entities were profitable. However, as market conditions slowed in 2007, cash flow problems arose. In an effort to mitigate these problems, the SunCal Debtors recommended closing several of the Projects and reducing the pace of work on others. The Lehman Entities rejected this recommendation. They insisted that development continue apace and they promised to pay the vendor bills being incurred at the Projects. They also insisted upon exercising more and more control over the Projects. In 2008, the Lehman Entities reneged on their promises of payment, and instead attempted to foreclose on the Projects. If this stratagem had succeeded, the hundreds of unsecured creditors who contributed over $100 million of goods and services to the Projects would have been left with nothing.[4]

**B.    LBHI's and LCPI's Chapter 11 Filings.**  LBHI filed a Chapter 11 petition on September 15, 2008 and LCPI filed for Chapter 11 on October 10, 2008.

**C.    The SunCal Debtors' Chapter 11 Filings.**  In November of 2008, the SunCal Debtors filed Chapter 11 proceedings in the California Bankruptcy Court to stay the Lehman Entities' foreclosure proceedings and to obtain time to reorganize their business affairs.

**D.    LCPI's Initial Ownership Misrepresentation in the 2008 NY RFS Motion.**
After the SunCal Debtors filed their Chapter 11 cases, LCPI represented to the SunCal Debtors that it continued to own the SunCal I Loan and the Ritter Ranch Loan. On the basis of this alleged

---

[4] See Cook Dec.

ownership interest, LCPI contended that any effort to use or otherwise affect the property subject to the liens securing these loans would violate the automatic stay in LCPI's Chapter 11 case.

In fact, LCPI's claim of ownership was a misrepresentation:[5] All right, title and interest in the SunCal I Loan and the Ritter Ranch Loan were sold to Fenway as of August 22, 2008, two months before LCPI filed Chapter 11 and three months before the SunCal Debtors filed Chapter 11.[6] LCPI made a third loan, the SCC Palmdale Loan in the approximate amount of $95 million (the "SCC Palmdale Loan"). This loan is nominally secured by equity interests of no value, unsecured pursuant to 11 U.S.C. § 506(a) and the lien is void pursuant to § 506(d).[7]

Faced with LCPI's ownership claim and automatic stay threats, and unaware of the sale of the loans to Fenway, the SunCal Debtors filed a motion in the New York Bankruptcy Court (the "2008 NY RFS Motion") wherein they sought relief from any stay applicable in LCPI's case to the extent necessary to pursue their own reorganization efforts.[8] LCPI opposed this motion and falsely represented to the New York Bankruptcy Court that it owned the SunCal I Loan and the Ritter Ranch Loan.[9] It further misrepresented that it would suffer harm if the 2008 RFS Motion was granted. On the basis of these falsehoods, the New York Bankruptcy Court denied the 2008 RFS Motion. Had the SunCal Appellants known that Fenway, not LCPI, held ownership of the SunCal I Loan and the Ritter Ranch Loan in November of 2008, they would never have filed the 2008 RFS Motion, since relief would have been unnecessary. *See Teachers Insurance and Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir.1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants.").

**E.    LCPI 's Relief from Stay Motions in California.** In January of 2009, LCPI filed six motions for relief from stay in the California Bankruptcy Court (the "Lehman CA RFS Motions") wherein LCPI again misrepresented that it owned the SunCal I Loan and the Ritter

---

[5] See "Ownership Findings" Conclusion 2.5, attached as Exhibit B to the Couchot Declaration.
[6] See "Ownership Findings" Finding 1.9 and Conclusion 2.4, attached as Exhibit B to the Couchot Declaration.
[7] See Couchot Dec., ¶¶ 35-38, and exhibits O and P.
[8] Couchot Dec., ¶¶ 13 and 14., and Exhibit C.
[9] Couchot Dec.,¶ 16 and Exhibit D.

Ranch Loan.[10] On the basis of this misrepresentation, LCPI argued that relief from the SunCal Appellants' automatic stay should be granted, since the SunCal Appellants' reorganization plan provided for the subordination of LCPI's claims, and this effort was barred by LCPI's automatic stay. The California Bankruptcy Court denied the Lehman CA RFS Motions.[11] In the order denying relief, the California Bankruptcy Court (still unaware of the transfer of ownership of the loans) held that LCPI's automatic stay argument was in error: An action to equitably subordinate a claim either through an adversary proceeding or Chapter 11 plan was "defensive" and hence did not violate the claimant's automatic stay (the "Stay Ruling").

F.    **The SunCal Debtors' Adversary Proceeding Against the Lehman Entities.** On January 6, 2009, the SunCal Appellants filed a complaint against various non-bankrupt Lehman-affiliates, including Lehman ALI and its successors, seeking the equitable subordination of their claims under 11 U.S.C. § 510(c) (the "ES Action"). The SunCal Appellants initially did not name LCPI as a defendant in the ES Action, due to its status as a debtor and its assertion of the automatic stay. However, in reliance on the Stay Finding, the complaint in the ES Action was amended in March 2009 to add LCPI as a defendant in connection with what the SunCal Debtors mistakenly believed were the three LCPI-owned loans. The SunCal Debtors did not seek any damages from LCPI in the ES Action. Rather, consistent with the Stay Finding, they sought only to equitably subordinate the claims that LCPI filed against the SunCal Debtors, and to void and/or transfer to the estates the liens associated with those claims.[12]

G.    **The SunCal Debtors' Plan and Disclosure Statement.**

Also, in February of 2009, the SunCal Debtors filed their Joint Plan and Disclosure Statement. Under the Plan, the SunCal Debtors incorporated the ES Action and sought to create a distribution to approximately $350 million of unsecured creditors.

H.    **The SunCal Debtors' Discovery of Fenway's Ownership of the Loans.** In May of 2009, after the CA RFS Motions were denied, the SunCal Debtors discovered that the Ritter

---

[10] Couchot Dec., ¶20 and Exhibit G.
[11] Couchot Dec., ¶¶22 and 24, and Exhibit I.
[12] Couchot Dec., ¶¶ 30-31, and Exhibit L.

Ranch Loan and the SunCal I Loan, as well as five loans claimed to be held by Lehman ALI, OVC and Northlake (collectively the "Sold Loans"), had been sold to Fenway pursuant to that certain Master Repurchase Agreement dated August 22, 2008 (the "MRA").

**I.** **The SunCal Debtors' Motion to Strike and the Ownership Findings.** After the SunCal Debtors discovered that the Lehman Entities did not own any interest in the Sold Loans, they filed a motion (the "Motion to Strike") to strike the POCs filed with respect to these claims (the "Disputed Claims"). At the June 30, 2009 hearing on the Motion to Strike, the California Bankruptcy Court ruled that the Lehman Entities had transferred *their entire interest* in the Sold Loans to Fenway, and that the Lehman Entities had made a "misrepresentation" when they asserted in the POCs that they, alone, were the creditors who owned the Sold Loans.[13]

These rulings were later incorporated into a series of findings (the "Ownership Findings") and an order (the "Ownership Order").[14] These findings are entitled to issue preclusion. *See Teachers*, 803 F.2d 61, 66 (2nd Cir. 1986); *see also, Celotex Corporation v. Edwards*, 514 U.S. 300 (1995). Accordingly, from August 22, 2008 through the date of this pleading, neither LCPI nor any other Lehman affiliate owned any interest in the Disputed Loans, and every statement or pleading that affirmatively represented a contrary position and that had invoked LCPI's automatic stay was a misrepresentation.

**J.** **Fenway's Inclusion in the Equitable Subordination Action.** In reliance on the Ownership Order, the SunCal Debtors filed an amended complaint in the ES Action naming Fenway as a defendant, in recognition of the fact it was the holder of the Sold Loans.[15]

**K.** **The Bankruptcy Appellant Panel Reverses the Stay Finding.** On December 15, 2009, the Bankruptcy Appellate Panel for the Ninth Circuit reversed the Stay Finding (the "BAP Order") in a divided two-to-one ruling. The SunCal Appellants have appealed this ruling to the Ninth Circuit Court of Appeals on various grounds. It is their contention that the BAP lacked

---

[13] "The Lehman Entities could not properly file the Proofs of Claim as 'creditors.' When they listed themselves as the "creditors" on the Proofs of Claims, this was a misrepresentation." See, Claims Finding 2.5 (Couchot Decl., Exh. B).
[14] Couchot Decl., Exhibits A and B.
[15] Couchot Dec., ¶¶ 30-31, and Exhibit L.

jurisdiction to hear the case, since the entire automatic stay argument was based upon an ownership claim that had already been determined not to exist. They also contend that this ruling is an error of law: An action to subordinate a filed claim does not violate the stay as a long as it does not seek relief outside the claim itself.

The BAP ruling had minimal impact on the SunCal Appellants' ES Action, since the claims they were seeking to subordinate were held by non-bankrupt Fenway and Lehman Entities who were not in Chapter 11. These entities were clearly not protected by LCPI's stay. In March of 2010, the California Bankruptcy Court dismissed LCPI from the ES Action on the basis of the BAP Order.[16] This dismissal eliminated any possible LCPI stay issues.

**L.    The Compromise Motion Filed by LCPI and LBHI.**  In April of 2010, LCPI and LBHI filed the Compromise Motion.[17] In this motion, LCPI and LBHI represented that they were "compromising" various issues and relationships arising out of the repurchase transaction described in the MRA (the "Repo"). [18] Before addressing this compromise, a review of the Repo and its relationship to other sequential transactions related thereto is in order.

Pursuant to the MRA, all right, title and interest in the Sold Loans was transferred to Fenway Capital.[19] Upon receipt of the Sold Loans, Fenway Capital issued a Variable Funding Note (the "VFN Note") to Fenway Funding, LLC ("Fenway Funding"), a related entity.[20] The VFN Note was backed by the Sold Loans. In reliance upon the VFN Note, Fenway Funding issued commercial paper notes (the "CP Notes"), which were acquired by LBHI. LBHI then pledged the CP Notes to JP Morgan Chase ("JP Morgan"), its primary lender. *Id.* This can be represented visually as follows:

---

[16] Couchot Decl.,  ¶ 40 and Exhibit R.
[17] Couchot Dec., Exhibit T.
[18] LCPI was obligated to repurchase the Sold Loans at the conclusion of the repurchase period for a sum in excess of $1.0 billion dollars, payable in "immediately available funds."
[19]Couchot Decl., Exhibit B, Findings 1.9 and 2.4..
[20] See Compromise Motion, ¶¶ 10-11, attached at Exhibit T to the Couchot Decl..



There is no evidence in the record that LBHI paid a penny for the CP Notes acquired from Fenway Funding. *Id.* The only party that appears to have advanced any real money or credit in this chain was JP Morgan.[21]  Accordingly, JP Morgan is the party who has always held the real "economic interest" in the Disputed Loans, since these loans "ultimately" serve as collateral for the repayment of the CP Notes. This conclusion is buttressed by the facts stated in that certain *Motion Pursuant To Section 363 Of The Bankruptcy Code And Bankruptcy Rule 6004 For Approval Of Collateral Disposition Agreement With JPMorgan Chase Bank, N.A., et al.*, which appears in the lower court's docket as Docket No. 7269 (the JPM Motion") (the "JPM Motion")[22] (See, Second O'Keefe Decl., Ex. B.)  The JPM Compromise motion describes a transaction pursuant to which LBHI paid JP Morgan over $500 million to obtain various benefits, including the release of the CP Notes. *Id.* Once this occurred, LBHI and LCPI were "free" to buy the Disputed Loans back from Fenway Capital through the transaction described in the Compromise Motion (the "Claims Transaction").

The Claims Transaction includes the following material terms: LBHI will return the CP Notes to Fenway Funding; Fenway Funding will cancel the CP Notes; Fenway Funding will cancel the VFN Note issued by Fenway Capital that backs the CP Notes; Fenway Capital will transfer title to the Sold Loans to LCPI; the MRA will be terminated; and the guarantee of

---

[21] See Compromise Motion, ¶ 17 attached to Couchot Decl., as Exhibit T.
[22] This motion is cited in the Compromise Motion and is attached to the Couchot Declaration as Exhibit S.

performance that LBHI issued in favor of Fenway Capital to secure LCPI's repurchase obligation under the MRA (the "Guarantee") will be terminated.[23]

On its face, the Claims Transaction leaves LCPI holding the Sold Loans and LBHI with no guarantee obligation and no interest in the Sold Loans.[24]  In later pleadings, LBHI and LCPI added a new wrinkle to this transaction. They represented to the lower court that Fenway Capital was transferring to LBHI the lien that Fenway Capital held on the Sold Loans under the terms of the MRA. "LBHI will become subrogated to the claims and other rights of Fenway under the Fenway Documents including Fenway's security interests in the Repo Assets."[25]  This lien was purportedly being granted to secure LBHI's obligations under the Guarantee. This last minute addition was obviously thrown together to give LBHI the ability to argue that its automatic stay would also block any effort by the SunCal Appellants to subordinate the Sold Loans, even if LCPI transferred title to the loans formerly owned by Lehman ALI, OVC and Northlake back to these non-debtor entities.

There were two fatal defects in this last minute contrivance. First, per the Compromise Motion, the MRA and Guarantee, the instruments that LBHI is purportedly relying upon for its new lien rights, are being terminated. To fix this inconvenient and fatal defect, the Lehman Entities placed a sweeping "notwithstanding" clause in their pleadings that effectively reads: "ignore the facts and accept our legal conclusions." Viewed in historical context, the Compromise Motion was filed to accomplish what LCPI's misrepresentations earlier in the case failed to accomplish – the improper use of the automatic stay as a sword to stay the ES Action and the SunCal Appellants' plan.

**M.    The SunCal Appellants' Limited Opposition to the Compromise Motion and the 2010 Relief from Stay Motion in New York.**  In the face of LCPI and LBHI's disclosed intent to buy the Disputed Loans and then attempt to offensively use their automatic stays to bar

---

[23] "Fenway Capital will assign to LCPI all of the Repo Assets *and the parties will terminate the MRA and the guaranty provided by LBHI with respect thereto.*" Compromise Motion, p.  9-10 attached as Ex. T (emphasis added).
[24] Compromise Motion, p. 9-10.
[25] Compromise Reply, p.2 ¶ 1, attached as Exhibit V to the Couchot Decl.

the ES Action, in April 2010 the SunCal Appellants filed a limited opposition (the "Opposition")[26] to the Claims Transaction and a related motion (the "RFS Motion")[27]. In the Opposition, the SunCal Appellants asked the lower court to bar the acquisition of the Disputed Loans, *to the extent necessary to prevent the Lehman Entities from using the transaction as means of interfering with the SunCal Appellants' Chapter 11 cases through the assertion of the automatic stay.* In the RFS Motion, the SunCal Appellants sought a ruling holding that any stay applicable on account of the Lehman Entities' post-petition acquisition of the Disputed Loans did not bar the ES Action, or alternatively an order granting relief from any stay that did arise on account of this transaction.

At the hearing on the Compromise Motion and the RFS Motion, the lower court overruled the Opposition to the Claims Transaction and denied the RFS Motion.[28] The order approving the Compromise Motion (the Compromise Order") was entered by the lower court on May 13, 2010.[29] The order denying the RFS Motion (the "RFS Order") was entered on May 17, 2010.[30]

**N.**     **The SunCal Appellants Appeal of the Compromise Order and the RFS Order.** The SunCal Appellants filed notices of appeal with respect to both the Compromise Order and the RFS Order on May 27, 2010.[31]

**O.**     **SunCal Appellants' Stay Pending Motion Appeal Before the NY Bankruptcy Court.** On June 16, 2010, the lower court denied the SunCal Appellants' motion for stay pending appeal.[32] While the lower court concluded there was a lack of evidence, the SunCal Appellants had filed extensive declarations Bruce Cook, Sean Okeefe, Paul Couchot and Robert Starkman.[33] Accordingly, the SunCal Appellants seek a stay of the Compromise Order and the RFS Order pending the conclusion of the appeals.

---

[26] Couchot Decl., Exhibit U.
[27] Couchot Decl., Exhibit W.
[28] See Transcript attached to Couchot Decl, as Exhibit BB.
[29] Couchot Decl., Exhibit CC.
[30] Couchot Decl., Exhibit DD.
[31] Couchot Decl., Exhibits EE and FF.
[32] Couchot Dec., ¶ 53.
[33] See Couchot Decl., Exhibits X, Y, Z, and AA.

# III.

## ANALYSIS OF FACTORS BEARING ON STAY

As previously stated, the two Orders entered by the lower court are integrally interrelated. The Compromise Order approves the Claims Transactions and the RFS Order interprets and validates its intended injunctive effect. Accordingly, the elements necessary for the relief are addressed on a consolidated basis.

**A.    The Risk of Irreparable Injury to Movants Absent a Stay.** As stated, the SunCal Appellants are in the midst of an ongoing reorganization effort in the Central District of California. Their joint plan of reorganization (the "Plan") will enable hundreds of creditors holding hundreds of millions of dollars of claims, who were victimized by the prepetition acts of the Lehman Entities, to potentially receive a substantial mitigating dividend. The completion of the ongoing ES Action, which has been pending in California for over a year, is central to this reorganization effort. If the Claims Transaction closes without deeming the stay to be inapplicable or lifted, it will materially impair, and irreparably damage this reorganization effort.[34] This impairment satisfies the irreparable harm standard. *In re Alert Holdings, Inc.*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 2007) (An action that threatens a reorganization effort constitutes irreparable harm); *see also In re Singer Co. N.V.*, 2000 WL 33716976, 5 (Bankr. S.D.N.Y. 2000); *In re Carabetta Enterprises, Inc.*, 162 B.R. 399, 407 (Bankr.D.Conn. 1993).

In contrast to these facts, no harm will be suffered by the Lehman Entities if a stay is granted. The Lehman Entities can simply transfer the loans previously owned by Lehman Ali, Northlake and OVC, all non-debtors, directly to these entities, *instead of parking these assets in LCPI to achieve a litigation advantage in the form of the automatic stay*. As for the remaining loans that were purportedly owned by LCPI prior to Repo, these loans also can also be transferred to Lehman ALI, LCPI's parent. This will have the same economic effect. Alternatively, LCPI and LBHI can stipulate to relief from stay.

---

[34] Starkman Declaration, attached to Couchot Decl., as Exhibit AA.

**B.** **Substantial Possibility of Success on Appeal.** In order to obtain a stay pending appeal, the movant must "demonstrate[] a substantial possibility, although less than a likelihood, of success on appeal.." *In re Deep*, 288 B.R. 27, 30 (N.D.N.Y. 2003); *In re General Credit Corp.*, 283 B.R. 658, 659 (S.D.N.Y. 2002). Both Orders suffer from a number of fatal legal infirmities, including the following:

1.    The Lower Court's Ruling on the Applicability of the Automatic Stay Was in Error. At the hearing on the RFS Motion, the lower court stated that the automatic stay in LCPI's case would bar the pursuit of the ES Action against the claims being purchased by LCPI through the Claims Transaction. In support of this ruling, the bankruptcy court cited Judge Gonzalez's unpublished ruling in *In re Enron*, 2003 WL 23965467 (Bankr. S.D.N.Y. 2003) (the "Enron Case"). The SunCal Appellants believe the lower court reliance upon the *Enron Case* is in error and that this ruling is limited to the facts. In essence, Judge Gonzalez concluded that the complaint *in totality* evidenced an offensive not defensive objective, and consequently violated the stay. The subordination action, in isolation, was not necessarily offensive.[35]

The case of *In re Metiom, Inc.,* 301 B.R. 634 (Bankr.S.D.N.Y.2003), another case in this district, reflects a correct statement of the law. In *Metiom*, Judge Drain held that an action under 11 U.S.C. § 510(c) that seeks only subordination is defensive, and not subject to the automatic stay. 301 B.R. 637-38. *Metiom* is consistent with other governing precedent in this Circuit. *See Olick*, 145 F.3d 513, 516 (2nd Cir. 1998); *Financial News Network Inc.*, 158 B.R. 570, 573 (S.D.N.Y. 1993); *Vitranschart*, 2000 WL 1239081 (S.D.N.Y.2000).

---

[35] Judge Gonzalez also authored the opinion in *In re Enron Creditors Recovery Corp.*, 410 B.R. 374 (S.D.N.Y.2008). In *Enron Creditors*, the court held that counterclaims based upon claims very similar to those asserted in the ES Action were core proceedings. In so ruling, the *Enron Creditor* court held: "It is this fundamental rule that underlies the later decisions in Katchen and Langenkamp. Once a party submits to the jurisdiction of the bankruptcy court by making a claim, the party submits to the jurisdiction of the Court to establish the respective rights of the parties." 410 B.R. at 383. Although this ruling addressed the issue of core jurisdiction and the waiver of the claimant's seventh amendment right, the same waiver analysis applies when a debtor-claimant files a claim, since the debtor-claimant is acting as a plaintiff. Jandous, 106 B.R. 48, 50 (Bankr.S.D.N.Y.1989); *In re Bona*, 110 B.R. 1012, 1023 (Bankr. S.D.N.Y.1990) ("If the debtor chooses to litigate post-filing in a non-bankruptcy forum, as Bona has done, then the opposing party is free to participate in the litigation to the full extent necessary to protect its rights.)

13

The similarities between the facts in the instant case and the *Financial News* case in particular are striking. Here, the SunCal Appellants filed the ES Action in response to the Disputed Claims filed by the Lehman Entities. Their action seeks subordination; no affirmative recovery is sought against the claimants. Similarly, in *Financial News*, Kaypro, a Chapter 11 debtor whose claim was pending in the United States Bankruptcy Court for the Southern District of California, filed claim in Financial News Network's Chapter 11 case. The latter case was pending in this district. When Kaypro's claim was disallowed by the bankruptcy court in *Financial News*, Kaypro appealed, contending that this relief was barred by its automatic stay. The District Court rejected this position, stating:

> In sum, both the language and purpose of section 362 indicate that the automatic stay in effect in the Bankruptcy Court for the Southern District of California did not preclude the New York Bankruptcy Court from sustaining FNN's objection to Kaypro's proof of claim filed in New York Bankruptcy Court. Accordingly, the Court finds that the order of the Bankruptcy Court for the Southern District of New York sustaining the objection to Kaypro's proof of claim was not a violation of the automatic stay in place in the Bankruptcy Court for the Southern District of California, and the Bankruptcy Court in New York exercised its appropriate jurisdiction to disallow Kaypro's proof of claim.

*Financial News*, 158 B.R. at 573.

The dissenting opinion by Judge Markell in the BAP decision, *In re Palmdale Hills Property, LLC*, 423 B.R. 655 (9th Cir.BAP 2009), rejected any distinction between the claims allowance process and subordination, relying upon the analysis in both *Metiom* and *In re Merrick*, 175 B.R. 333 (9th Cir. BAP 1994). Id. at 668-670. Judge Markell further rejected any distinction based upon the subordination of a *secured* claim:

> In this context, adjustment of lien priorities is no different from an adjustment of claim priorities. A lien is nothing but an incident of the debt it secures; there can be no lien without a debt to support it. *See, e.g., Satsky v. United States*, 993 F.Supp. 1027, 1029 (S.D.Tex.1998). As a result, if no stay relief is necessary to adjust priority of payment, no stay relief should be necessary to adjust liens securing those debts.

Id., 423 B.R. at 670-671.

The Second Circuit's ruling in *Olick*, 145 F.3d 513, 516 (2nd Cir. 1998) is also factually on point and contrary to the lower court ruling. In *Olick*, a Chapter 13 debtor filed a claim in the district court seeking payment from a class action settlement for services rendered. The debtor in Olick also objected to the fees sought by counsel to the class and sought a stay of distributions from the settlement fund until an adversary proceeding that he was pursuing in bankruptcy court was resolved. The district court overruled Olick's objection to class counsel's fees, denied his request for a stay and partially denied Olick's fee request. Olick appealed this ruling and argued that the district court violated his automatic stay by denying his motion to stay the distribution, since this would necessarily reduce Olick's distribution from that pot. The Second Circuit rejected this contention stating:

> The district court did not err in denying Olick's motion to stay the proceedings. As the district court correctly pointed out, the automatic stay pursuant to 11 U.S.C. § 362 enjoins actions "*against* the debtor" (emphasis supplied). It prevents the commencement or continuation, after a bankruptcy petition has been filed, of lawsuits and proceedings to recover a claim against the debtor that arose before the filing of the petition. 11 U.S.C. § 362(a); *Koolik v. Markowitz*, 40 F.3d 567 (2d Cir.1994) (per curiam). **In the case at bar, the opposite occurred: No party sought to recover a claim "against" Olick; rather, Olick sought to recover from the settlement fund.**

145 F.3d 513, 516 (emphasis added).

Here, as in the *Olick* case, LCPI comes to the SunCal Appellants' cases as a *claimant* seeking payment through the assertion of claims. The SunCal Appellants have responded to these payment demands by objecting to the same through the ES Action. This action, like the action in *Olick*, seeks relief against the claims only. On these facts, the stay has no application. *See also Washington Mutual, Inc. v. F.D.I.C.*, 659 F.Supp.2d 152 (D.D.C.2009) (reaching essentially the same result as *Olick* on different facts.); *Vitranschart*, 2000 WL 1239081, at *5 ("Nor does the stay apply to Mac Truong's third-party complaint, cross-claims, or counterclaims, since the automatic stay provision applies only to claims "against the debtor" and not to claims brought by the debtor against other parties"); *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1473

(D.C.Cir.1991). (The stay does not force a Chapter 11 debtor to capitulate to the claims filed by another Chapter 11 debtor).

At bottom, the lower court's ruling was premised upon the assumption that one particular type of counterclaim/objection—an action under 11 U.S.C. § 510(c)—falls outside the claims allowance/disallowance process and consequently is barred by the stay as "offensive." This conclusion is contrary to precedent. Both the Supreme Court and Second Circuit have held that counterclaims filed in response to claims, which seek recourse against those claims, whether in the form of an adversary proceeding or otherwise, fall within the claims allowance/disallowance process. *Katchen*, 382 U.S. 323 (1966); *see also In re Danbury Square Associates, Ltd. Partnership*, 150 B.R. 544, 547 (Bankr. S.D.N.Y.1993) ("[A] trustee's objection to a lien or claim bottomed on the concept of equitable subordination pursuant to 11 U.S.C. § 510(c) does implicate the process of allowance or disallowance of claims which is expressly described as a core proceeding under 28 U.S.C. § 157(b)(2)(B)."); *In re Iridium*, 285 B.R. 822 (S.D.N.Y.2002); *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 854 (E.D.N.Y. 1995) ("In this case, the Debtor has been summarily deprived of the right to try its equitable subordination claim on the merits in the only available forum, the Bankruptcy Court. This resulted in the deprivation of a significant right on behalf of the Debtor. The right to equitable subordination in a bankruptcy proceeding is so important that it has been adjudicated as a defense to a motion for relief from the automatic stay.")

      2.    In Denying the RFS Motion, the Lower Court Did Not Use or Correctly Apply the Applicable Legal Standard. In denying the RFS Motion, the lower court stated that it was relying upon the "balance of the harms" factor cited by the Second Circuit *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2nd Cir. 1990). However, a review of the record confirms that the lower court did not, in fact, use or apply this criterion in its decision. The following section of the transcript makes this crystal clear:

> Ultimately, the question of whether or not I should grant relief from the automatic stay is driven by my application of the Sonnax factors. And both parties appear to be focused most heavily on the balance of harms factor. That's convenient because I prefer to focus on that one myself. One of the

> reasons I have a difficult time finding that there is any material harm to the
> SunCal debtors in not granting their motion for stay relief is that they did not
> bring it until now. The SunCal debtors have scrupulously avoided coming
> into this court from November of 2008 until today. And have managed to
> deal with their litigation requests in the bankruptcy court and beyond
> apparently without material impairment in those efforts. In effect, they've
> elected their remedy. They have chosen to proceed with litigation in their
> home court. And when they suffered a reversal at the BAP level at the end of
> last year then had to review their strategy again. Having gone to the Ninth
> Circuit, I believe the Ninth circuit is the place for this question to be decided.
> And I'm going to defer my decision with respect to stay relief until after the
> Ninth Circuit has acted.

(Couchot Decl., Exhibit BB, Transcript p. 73.) In essence, the lower court ruled that since the

SunCal Appellants ostensibly had elected to determine the applicability and scope of the LCPI's

automatic stay in the California Bankruptcy Court, they should be forced to await a ruling in the

Ninth Circuit, before they had a right to a ruling in the New York Bankruptcy Court on essentially

an unrelated issue relating to the interaction of the stay and the proposed Claims Transaction that

LCPI brought before his Honor. This analysis is neither factually nor legally correct. First, LCPI

raised the issue of the stay in California and appealed the ruling to the Ninth Circuit BAP.

Secondly, it has no bearing on the relative harm to the parties on a completely different

transaction.

       3.    <u>Relief from Stay in New York Was Justified Under the Balance of the</u>

<u>Harms</u>. The evidence relevant to *Sonnax*'s balance of the harms factor established that a failure to

modify to the stay would: (a) allow LCPI and LBHI to buy into the ES Action and Plan

confirmation and to use their automatic stays to delay the same;[36] (b) effectively enjoin seventeen

in-process reorganization efforts;[37] (c) enjoin an ongoing litigation matter that is central to the

SunCal Appellants' reorganization efforts;[38] (d) allow the Lehman Entities to obtain an unfair

advantage in the plan confirmation contest that is ongoing in California, since the Lehman

Entities' plan could proceed, but the SunCal Appellants could not;[39] (e) hold thousands of acres of

---

[36] Lehman Response, ¶ 17, attached as Exhibit V to Couchot Decl.
[37] Couchot Decl., Exhibit Q.
[38] Couchot Dec., Exhibit L and Q.
[39] Couchot Decl., P and Q.

MAINDOCS-#147532-v5-SCC_EMG_Mtn_Stay_Pending_Appeal_DC_SDNY.DOC

real property under development in California in stasis resulting in the hundreds of thousands, if not millions of dollars in additional costs;[40] (f) allow a the Lehman Entities to buy a series of disputed claims in search of a profit, and then use the automatic stay to leverage the collection of these claims);[41] and (g) impair the rights of the hundreds of creditors holding, collectively, over $100 million in claims against the SunCal Appellants.

In contrast to these harms, the evidence established that the Lehman Entities would suffer little if any harm if relief were granted: (a) The Lehman Entities participated in the ES Action for over a year without complaining about the purported "harm" associated with this participation, and in fact they affirmatively advised the California Bankruptcy Court that their stay was not an issue; (b) the Lehman Entities' cases are liquidations, and the professional liquidators managing this process will not be inconvenienced by the lawsuit; (c) the Lehman Entities are represented by the two largest Chapter 11 firms in the world, Weil Gotshal & Manges, LLP and Pachulski, Stang, Ziehl, Jones & Weintraub, LLP. Accordingly, they have more than sufficient resources to defend the ES Action, particularly since the attorneys involved in this ES Action have no involvement in the Lehman Entities' Chapter 11 work; (d) LCPI is voluntarily re-joining the ES Action after being dismissed out sixty days ago. Accordingly, it comes to this action as willing participant seeking a profit; (e) LBHI never had any interest in the property at issue in the ES Action. It also comes to this dispute as party seeking to enforce a claim for profit; and (f) the California Bankruptcy Court has exclusive jurisdiction over the property subject to any liens asserted by the Lehman Entities and any distributions payable from the proceeds of these assets, and so the Lehman Entities benefit from expeditious resolution of the ES Action. In Summary, when the balance of the harms required under the *Sonnax* case is applied to these facts, relief from stay was justified. The lower court's ruling to the contrary was clear error.

4.    The Court has an Equitable Duty to Lift the Stay to Assert Counterclaims.

Even assuming *arguendo* that LCPI's stay applies to the equitable subordination of its Disputed

---

[40] Starkman Declaration, attached to Couchot Decl., at Exhibit AA.
[41] Lehman Response, ¶ 23-24, attached to Couchot Decl., at Exhibit V.

Claims, subordination would be in the nature of a counterclaim to LCPI's assertion of its Disputed

Claims. "Cause" exists for relief from stay where the movant merely asserts a counterclaim

against a debtor's claim. See *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2nd Cir.

1979) ("[We] must be cautious to avoid a decision which could convert [the automatic stay] from

a shield into a weapon. Where a debtor institutes a lawsuit and then invokes the protection of [the

automatic stay] on a counterclaim, the situation warrants a very thoughtful scrutiny. Just as the

court has discretion to deny setoffs in appropriate cases, so the court has an equitable duty to grant

a setoff when a debtor moves outside the confines of the bankruptcy court in an attempt to reap the

benefits but circumvent the burdens in another forum."); *In re Saxon Industries, Inc.* 43 B.R. 64,

67 (Bankr.S.D.N.Y. 1984); *In re Wedtech Corp.*, 87 B.R. 279, 289 (Bankr.S.D.N.Y. 1988).

     5.    <u>The Lower Court Failed to Apply the Proper Standard When Reviewing the</u>

<u>Compromise Motion</u>. A court can endorse a settlement only if "the compromise is fair, reasonable

and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982). When a collusive

settlement, such as the Claims Transaction, severely damages the rights of third parties, by design,

the court cannot, as here, simply brush aside this impact. *See In re Masters Mates & Pilots*

*Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1025 (2d Cir. 1992) ("[I]f third parties

complain to a judge that a 'decree will be inequitable because it will harm them unjustly, he

cannot just brush their complaints aside.'") (citation omitted). The rights of third parties are a

material factor in the approval process. *See In re Masters Mates & Pilots Pension Plan and IRAP*

*Litigation*, 957 F.2d 1020, 1025 (2d Cir. 1992) ("In other words, where the rights of one who is

not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not

enough to earn the judicial stamp of approval."); *see also Donovan v. Robbins,* 752 F.2d 1170,

1176 (7th Cir.1985) ("Even if no third party complains, the judge has to consider whether the

decree he is being asked to sign is lawful and reasonable as every judicial act must be."). Here, the

lower court did not follow this standard, but instead looked solely to what was alleged to be in the

best interests of the Lehman Entities. For the reasons stated below, this failure is reversible error.

a.   The Compromise Motion Was the Result of a Collusive Effort to Achieve an Improper Purpose.  The Claims Transaction described in the Compromise Motion was designed to achieve an objective that is barred by a well established body of law in the Second Circuit: The use of the automatic stay as sword to obtain an unfair litigation advantage. *Bohack,* 599 F.2d 1160, 1168 (2nd Cir. 1979) ("[We] must be cautious to avoid a decision which could convert [the automatic stay] from a shield into a weapon."); *Jandous,* 106 B.R. 48, 50 (Bankr.S.D.N.Y.1989) ("The purpose of the stay is the protection of the debtor, ***but when the debtor is in the position of the assailant***, rather than the defendant, it would be inequitable to invoke the stay against the defendant's counterclaim, or to permit the debtor to use the stay as a basis for extending the time to remove the state court action to the bankruptcy court.") (emphasis added); *In re Saxon Indus., Inc.*, 43 B.R. 64, 67 (Bankr. S.D.N.Y. 1984) ("In light of the litigation initiated by Saxon, it would clearly be inequitable to allow Saxon to use § 362 to prevent Fox from pressing counterclaims."); *In re Wedtech Corp.*, 87 B.R. 279, 289 (Bankr. S.D.N.Y. 1988) ("Here, were the stay not to be lifted in the adversary proceeding for all purposes, [counter-claimant] would never be able to fix its claim, a result which is highly inequitable in light of [debtor's] suit against [counter-claimant].")

The automatic stay was intended to serve as a shield, not as a litigation sword, or worse, a collection mechanism. The evidence in this case (including the frank admissions of the Lehman Entities) establishes that the Claims Transaction described therein was designed to drag assets acquired post-petition within the stay's umbrella. This design was implemented to achieve the following improper purposes: (a) *To Obtain An Unfair Litigation Leverage In The ES Action*. The Lehman Entities wanted to bar the continued pursuit of the ES Action and through this interference to achieve unjustified settlement leverage; (b) *To Obtain An Unfair Advantage In The Plan Contest*. The Lehman Entities and the SunCal Appellants are in the midst of a plan confirmation contest pursuant to which both parties have filed competing plans of reorganization.[42] The Claims Transaction was filed to bar the SunCal Appellants' from moving

---

[42] See, Exhibits N and Z to Couchot Decl.

forward with their plan of reorganization, since this plan includes a provision subordinating the

Disputed Claims; (c) *To Collect On The Disputed Claims.* The Lehman Entities are purchasing the

Disputed Claims *as a post-petition for-profit investment.*[43] The Compromise Transaction was

designed to convey upon the Lehman Entities litigation leverage that would advance their

collection efforts.

        The Compromise Order effectively authorizes a bad faith transaction

designed to achieve improper purposes, through improper means. This ruling was in error. *Matter*

*of Brannan*, 40 B.R. 20, 24-25 (Bankr.N.D.Ga. 1984) (an attempt to "shield a property interest

under the automatic stay by conveying the property interest to" the debtor during the pendency of

the bankruptcy "would be an abuse of the bankruptcy process."); see *generally, In re Poindexter*,

2004 WL 3019347 (Bankr.M.D.N.C. 2004) ("The requirement of good faith is intended to prevent

abuse of the bankruptcy process by debtors who invoke bankruptcy to achieve an improper

purpose or to take unfair advantage of their creditors.").

        b.    The Compromise Motion and the Compromise Order Violated the

SunCal Appellants' Automatic Stay. LCPI and LBHI have admitted in prior pleadings that they

are acquiring the Disputed Claims from Fenway, post-petition, in order to capitalize on what they

perceive to be the long term profit potential in these assets. (Second O'Keefe Decl., Ex. B.) Since

the Disputed Claims constitute *prepetition* claims against the SunCal Appellants, any party

acquiring the same is subject to the automatic stay applicable in the SunCal Appellants Chapter 11

cases. 11 U.S.C. § 362(a). Section 11 U.S.C. § 362(a)(1) bars "the issuance or employment of a

judicial administrative, or other action or proceeding against the debtor that was or could have

been commenced" against the SunCal Appellants prepetition. Section 362(a)(3) bars any act "to

exercise control over property of" the SunCal Appellants' estates. Finally, Section 362(a)(4)

---

[43] See JPMorgan Compromise Motion, pg. 4 ¶ 6 ( "After such application, the remaining Collateral will consist of assets that are largely illiquid in the current economic environment or whose disposition at this time would result in substantially diminished returns. Such assets would benefit from long-term, active and effective management. The Debtors believe that the Agreement will provide the Debtors with a means of administering such remaining illiquid Collateral in the manner most conducive to enhancing recoveries.") attached to Couchot Declaration as Exhibit S.

and (a)(6) bar any act to "enforce any lien against the property of the estate" or "any act to collect, assess or recover a claim against" the SunCal Appellants' prepetition.

A review of the Compromise Motion and the statements made by LCPI and LBHI in the pleadings filed in support thereof lead to only one conclusion: The Claims Transaction is clearly an "act to recover" the Disputed Claims against the SunCal Appellants, and the Compromise Order is the "employment of ... any action or proceeding against the debtor" that "could have been commenced" by the holders of the Disputed Claims prepetition. 11 U.S.C. § 362(a)(1). These stay violations were undertaken to aid LCPI and LBHI in the collection of their newly acquired assets.

The evidence in support of these conclusions is compelling. The Lehman Entities did not own the Disputed Claims prior to the Claims Transaction. The Lehman Entities purchased the Disputed Claims with full knowledge of the litigation in California. They knew that parking this investment in LCPI would enable them to argue that LCPI's stay barred the ongoing ES Action. (O'Keefe Decl., Ex. B.)). The Lehman Entities knew that staying the Plan and the ES Action would provide critical leverage in their efforts to enforce the Disputed Claims, or to force a settlement of the ES Action.[44] The Lehman Entities could have used any one of a number of non-debtor Lehman Entities to acquire the Disputed Claims, since these assets were being acquired *in an entirely new transaction outside the parameters of the MRA*. Instead, they selected LCPI as the buyer, in order to create the best enforcement mechanism possible – the automatic stay in LCPI's case. The Lehman Entities worked LBHI into the Claims Transaction—even after the Compromise Motion was originally filed—through the purported transfer to this entity of a non-existent lien, to provide a "back-up" to LCPI's stay argument. (Lehman Response, ¶ 24).

In sum, the Claims Transaction was designed to drag the disputed the Disputed Claims within the reach of LCPI and LBHI's stay, in order to "enjoin" the SunCal Appellants'

---

[44] Lehman Response, ¶ 17 ("Instead, they argue that, to the extent LCPI intends to 'invoke its automatic stay to block pending litigation . . . relief should be denied.' Opposition at 5.15. *But this argument ignores a key fact – LCPI's automatic stay will attach to the property it receives as part of the Transaction as a matter of law, regardless of LCPI's intent.*").

reorganization effort, and to thereby facilitate the enforcement and collection of the Disputed Claims. This action violated the SunCal Appellants' stay. *See In re Greene*, 50 B.R. 785, 787 (S.D.N.Y. 1985) ("The automatic stay proscribes the commencement or continuance of actions, including the issuance of process, to recover prepetition claims against debtors.); *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789, 798 (Bankr.S.D.N.Y.1990); *see also, National Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 707-708 (7th Cir. 1994) (Issuance of injunction by district court that interferes with property of the estate violates the automatic stay); *Matter of McKanders*, 42 B.R. 108, 109 (Bankr.N.D.Ga.1984) ("The automatic stay which is issued when initiating a new case may not be used to abuse or thwart prior proper orders of the court in a prior case."). **This part of the Claims Transaction and the Compromise Order approving the same is void.** *Eastern Refractories Co., Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir.1998) (automatic stay is effective immediately upon filing of bankruptcy petition, and any subsequent proceedings against debtor or debtor entities are void); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir.1994) .

     c.  The Compromise Order Created an Injunction Where No Grounds for Injunctive Relief Were Established.  Prior to the adoption of the 1984 amendments to the bankruptcy code, the bankruptcy courts lacked the power to enjoin another court. *Celotex Corporation v. Edwards*, 514 U.S. 300, 328 (1995) ("Thus, for well over 50 years prior to the adoption of the 1984 amendments to the Bankruptcy Code, it was clear that Congress intended to deny bankruptcy judges the power to enjoin other courts."). Although the bankruptcy courts are now afforded this power under 11 U.S.C. § 105, this power can only be exercised to enforce another substantive right provided for in the Bankruptcy Code, and then only in compliance with the procedural requirements in Fed.R.Civ.P. 65. *In re Luis Elec. Contracting Corp.*, 917 F.2d 713, 716 (2nd Cir. 1990).

        In this case, assets are being dragged into the estate, post-petition, to create a "stealth" injunction that will bar another bankruptcy court from exercising a core statutory function, *S.G. Phillips Constructors v. City of Burlington*, 45 F.3d 707, 705 (2nd Cir. 1995)

("Nothing is more directly at the core of bankruptcy administration ... than the quantification of all liabilities of the debtor."). This injunction will also freeze in place seventeen pending Chapter 11 cases. Although the Lehman Entities contend that that this injunction will arise "by operation of law," this claim is disingenuous. Although the Lehman Entities dragged the road over to roadblock, instead of vice versa, the legal result is the same—the SunCal Appellants' Chapter 11 cases and the powers of another court are enjoined.

An injunction is an extraordinary remedy and will be only be granted upon strong showing that satisfies the procedural requisites and offers the enjoined party the requite protections. *See Reynolds v. Giuliani*, 506 F.3d 183, 198 (2nd Cir. 2007) ("The authority to issue an injunction is an extraordinary and powerful one that is to be used sparingly and cautiously and only in a 'clear and plain' case."); Fed.R.Civ.P. 65.  Here, this standard was not applied and none of the requirements necessary for injunctive relief were satisfied. This was clear error. *See In re Commonwealth Oil Ref. Co.,* 805 F.2d 1175, 1188-89 (5th Cir.1986) ("[T]he legislative history of § 105 makes clear that stays under that section are granted only under the usual rules for the issuance of an injunction."), *cert. denied,* 483 U.S. 1005 (1987).

## C.   <u>The Balance of the Hardships Tips Decidedly in Favor of the SunCal Appellants.</u>

If the relief granted by this Court is not stayed, the SunCal Appellants will be deprived of the ability to resolve a priority dispute that impacts eighty percent of the claims filed against their estates. This relief effectively enjoins their in-process reorganization efforts, while at the same time allowing the Lehman Entities to pursue their competing plan efforts in the same cases. In effect, the Orders turn the SunCal Appellants into the Lehman Entities' punching bag for the foreseeable future, without any ability to seek recourse. In contrast to the harm inflicted upon the SunCal Appellants, if the Motion is granted, the Lehman debtors will suffer no discernable detriment, *since they are not even defendants in the ES Action.* The only parties who might suffer are Fenway Capital and the non-debtor Lehman Entities, and their detriment is irrelevant. On these facts, the hardships tip decidedly in favor of the SunCal Appellants.

**D.    The Public Interest Favors a Stay.** The automatic stay was intended to serve as a shield, not as a litigation sword, or worse, a collection mechanism. The evidence in this case (including the frank admissions of the Lehman Entities) establishes that the Compromise Motion and the Claims Transaction described therein were designed to drag assets acquired post-petition within the stay's umbrella and were therefore filed in bad faith. If this stratagem proceeds, seventeen reorganizations cases will be stayed and core powers vested in another court by Congress will be impaired. In effect, there will be a de facto ratification of all of LCPI's past representations. In contrast, if a stay is granted, the Lehman Entities liquidation will proceed and the SunCal Appellants will be able to pursue their reorganization efforts. On these facts, the public interest favors the issuance of a stay pending appeal of the Court's rulings.

## IV.

## CONCLUSION

The lower court's Orders authorize what is in effect an injunction-by-contract that converts the automatic stay into a sword, in violation of clear precedent. These Orders also hold that the stay bars another court from exercising a core power with respect to filed claims. It does not. Finally, even if the lower court's interpretation of the reach of the stay is sustainable, granting relief from this stay was compelled on the facts. If these errors of law are allowed to stand, seventeen other pending Chapter 11 cases, which have an equal right to seek reorganization under the bankruptcy code, will be irreparably harmed. In contrast, if a stay is granted, the Lehman Entities will suffer no harm.

Dated: June 16, 2010                    Respectfully submitted,

                                         /s/  Sean A O'Keefe
                                         Sean A O'Keefe
                                         Paul J. Couchot
                                         WINTHROP COUCHOT, P.C.
                                         660 Newport Center Drive, Fourth Floor
                                         Newport Beach, CA 92660
                                         Telephone: (949) 720-4100
                                         Facsimile: (949) 720-4111

                                         *Attorneys for the SunCal Appellants*

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4ᵗʰ Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **SUNCAL APPELLANTS'** *EMERGENCY* **MOTION AND MEMORANDUM OF LAW PURSUANT TO FED. R. BANKR. P. 8005 FOR STAY PENDING APPEAL OF ORDER APPROVING DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR AUTHORITY TO COMPROMISE CONTROVERSY IN CONNECTION WITH A REPURCHASE TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER PROGRAM WITH FENWAY FUNDING, LLC** *AND* **FOR STAY PENDING APPEAL OF ORDER DENYING MOTION OF THE SUNCAL DEBTORS FOR AN ORDER DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY; OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 16, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Email: shai.waisman@weil.com
Email: alfredo.perez@weil.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 16, 2010 | Susan Connor | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#147532-v5-SCC_EMG_Mtn_Stay_Pending_Appeal_DC_SDNY.DOC